UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HASNIJA STUPAR,

       Plaintiff,

v.                               CASE NO. 3:15-cv-555-J-34MCR

METROPOLITAN LIFE INSURANCE
COMPANY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Plaintiff's Dispositive Motion for Final

Summary Judgment ("Plaintiff's Motion") (Doc. 19), Defendant's Opposition

thereto (Doc. 25), Defendant's Motion for Final Judgment ("Defendant's Motion")

(Doc. 20), Plaintiff's Memorandum in Response thereto (Doc. 24), and

Defendant's Reply (Doc. 35), filed pursuant to the Court's Orders (*see* Docs. 28,

---

[1] "Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion,] a party may serve and file specific written objections to the proposed findings and recommendations." Fed.R.Civ.P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id*. A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was not made. *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; M.D. Fla. R. 6.02.

32, 34).[2]  For the reasons stated herein, it is respectfully **RECOMMENDED** that

Defendant's Motion be **GRANTED** and Plaintiff's Motion be **DENIED**.

## I.    Introduction

This action is brought under the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  (Doc. 1, ¶ 1.)  Plaintiff challenges

Defendant's decision to terminate her long term disability ("LTD") benefits under

the Kroger Co. Health and Welfare Plan (the "Plan"), which is governed by

ERISA, sponsored and administered by the Kroger Company, and insured by

Metropolitan Life Insurance Company ("MetLife"), which acts as a claim

administrator for LTD benefits under the Plan.  (Doc. 1, ¶¶ 6-7, 11; Doc. 1-1 at 3,

39; Doc. 7, ¶¶ 5-6.)  Plaintiff was a participant in the Plan through her

employment as an icing operator with the Kroger Company.  (Doc. 1, ¶ 4; AR

1808.)[3]

On March 21, 2011, Plaintiff became disabled due to post-traumatic stress

disorder ("PTSD"), major depression, panic, and anxiety disorder, for which she

was paid LTD benefits under the Plan from September 17, 2011 to September

16, 2013.  (AR 369, 1591-92, 1808.)  MetLife terminated Plaintiff's LTD benefits

---

[2] On August 13, 2015, before the Motions were filed, this case was referred to the undersigned for a report and recommendation regarding an appropriate resolution of the case.  (Doc. 14.)

[3] All citations to the administrative record filed with the Court (*see* Doc. 18), are in the format "AR [page number]" in this Report and Recommendation.

beyond September 16, 2013 based on the Plan's 24-month limitation.  (AR 370,

1520-23.)  Plaintiff claims that she remains disabled as defined by the Plan and,

therefore, her LTD benefits should not have been terminated.  (Doc. 1, ¶ 9.)

## II.     Summary of Facts

### A.     The LTD Plan

The Plan provides in relevant part: "MetLife in its discretion has authority to

interpret the terms, conditions, and provisions of the entire contract."  (Doc. 1-1 at

4.)  Also, "the Plan Administrator and other Plan fiduciaries shall have

discretionary authority to interpret the terms of the Plan and to determine

eligibility for and entitlement to Plan benefits in accordance with the terms of the

Plan."  (Doc. 1-1 at 41.)  "Any interpretation or determination made pursuant to

such discretionary authority shall be given full force and effect, unless it can be

shown that the interpretation or determination was arbitrary and capricious."  (*Id.*)

In order to receive benefits under the Plan, the following must be provided:

proof of disability, evidence of continuing disability, proof that the employee is

under the appropriate care and treatment of a doctor throughout the disability,

information about other income benefits, and any other material information

related to the disability which may be requested.  (*Id.* at 16.)

Proof of disability "includes, but is not limited to: 1. the date your Disability

started; 2. the cause of your Disability; and 3. the prognosis of your Disability."

(*Id.* at 31.)  Proof must be provided "within 3 months after the end of your

Elimination Period." (*Id.*)  "Your Elimination Period begins on the day you become Disabled.  It is a period of time during which no benefits are payable. . . . You must be under the continuous care of a Doctor during your Elimination Period."  (*Id.* at 18.)  "Appropriate Care and Treatment" is defined as:

> [M]edical care and treatment that meet all of the following:
>
> 1.   it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
> 2.   it is necessary to meet your basic health needs and is of demonstrable medical value;
> 3.   it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;
> 4.   it is consistent with the diagnosis of your condition; and
> 5.   its purpose is maximizing your medical improvement.

(*Id.* at 19.)

> Disability is defined as follows:
>
> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.   during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2.   after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(*Id.*)

4

The monthly benefits under the Plan are limited to 24 months in one's

lifetime, if the disability is due to a:

1.      Mental or Nervous Disorder or Disease, unless the Disability
        results from:

        a.      schizophrenia;
        b.      bipolar disorder;
        c.      dementia; or
        d.      organic brain disease.

        "Mental or Nervous Disorder or Disease" means a medical
        condition of sufficient severity to meet the diagnostic criteria
        established in the current Diagnostic And Statistical Manual Of
        Mental Disorders.  You must be receiving Appropriate Care
        and Treatment for your condition by a mental health Doctor.

2.      Neuromusculoskeletal and soft tissue disorder including, but
        not limited to, any disease or disorder of the spine or
        extremities and their surrounding soft tissue; including sprains
        and strains of joints and adjacent muscles, unless the
        Disability has objective evidence of:

        a.      seropositive arthritis;
        b.      spinal tumors, malignancy, or vascular malformations;
        c.      radiculopathies;
        d.      myelopathies;
        e.      traumatic spinal cord necrosis; or
        f.      masculopathies.

3.      Chronic fatigue syndrome and related conditions.

        In no event will Monthly Benefits be payable longer than the
        Maximum Benefit Duration shown in the Plan Highlights.

(*Id.* at 27-28.)

With respect to legal actions, the Plan provides:

No legal action of any kind may be filed against us:

1. within the 60 days after proof of Disability has been given; or
2. more than three years after proof of Disability must be filed.  This will not apply if the law in the area where you live allows a longer period of time to file proof of Disability.

(*Id.* at 33.)

### B.    Plaintiff's LTD Benefits

Plaintiff last worked as an icing operator on a production line for the Kroger Company on March 18, 2011.  (AR 369, 1808.)  Her disability began on March 21, 2011 due to PTSD, major depression, panic, and anxiety disorder. (*Id.*)

MetLife approved and paid LTD benefits to Plaintiff for the period of September 17, 2011 through September 16, 2013.[4]  (AR 370, 1741.)  MetLife approved Plaintiff's claim for LTD benefits by a letter dated October 17, 2011. (AR 1741.)  The letter provided in relevant part:

> Our records indicate that you are currently disabled due to Post Traumatic Stress Syndrome, which is a Mental or Nervous Disorder or Disease condition.  This condition is limited to 24 months of benefits in your lifetime, as stated above.  Therefore, the maximum benefit duration due to the limited conditions will be reached on September 16, 2013. . . .
> Benefits may continue after September 16, 2013 if you continue to satisfy the definition of disability solely due to other non-limited medical condition(s) and other plan requirements.

(AR 1743.)

On February 12, 2013, MetLife sent Plaintiff a letter requesting additional information in order to evaluate her claim "for both the upcoming change in the

---

[4] Benefits became payable as of September 17, 2011 after satisfaction of the elimination period.  (AR 1741.)

6

definition of disability and for the plan limit on benefits due to a limited condition."

(AR 1605.)  The letter advised:

> Our file reflects that your disability began on March 21, 2011.  Your
> claim for long-term disability benefits is currently approved because
> you are disabled from performing your own occupation.  For benefits
> to continue beyond September 16, 2013, you must be disabled from
> performing any occupation as defined in the definition of disability
> stated above.
>
> In addition to this change in the definition of disability, your
> employer's plan contains limits on benefits for certain conditions. . . .
>
> In reviewing your file, the medical documentation indicates that you
> are disabled due to posttraumatic disorder and major depressive
> disorder.  This diagnosis falls under the limited benefit provision of
> your Plan, and has a limitation of 24 months of benefits.

(AR 1604.)

On July 19, 2013, MetLife sent Plaintiff another letter regarding her LTD

benefits.  (AR 1525.)  The letter provided in relevant part:

> In reviewing your file, the medical documentation indicates that you
> are disabled due to Posttraumatic Disorder and Major Depressive
> Disorder.  These diagnoses falls [sic] under the limited benefit
> provision of your Plan, and have a limitation of 24 months.  Therefore
> the maximum duration for benefit payments is September 16, 2013.
>
> Please advise us of any changes that might impact your benefits,
> such as a change in your medical condition, a return to work or
> receipt of other income.

(*Id.*)

By a letter dated August 28, 2013, MetLife terminated Plaintiff's LTD

benefits beyond September 16, 2013.  (AR 370, 1520-23.)  The letter provided in

relevant part:

> In reviewing your file, the medical documentation indicates that you
> are disabled due to Posttraumatic Stress Disorder and Major
> Depressive Disorder.  These diagnoses fall under the limited benefit
> provision of your Plan and have a limitation of 24 months. . . . All
> medical information received and reviewed does not indicate that
> you are experiencing deficits in function due to a disability that is a
> non-limited condition nor considered an exclusionary diagnosis as
> previously mentioned above.
>
> Based on a review of your entire file, our records indicate that you
> will have received 24 months of LTD benefits on September 16,
> 2013 for a Mental or Nervous Disorder or Disease, and this is the
> maximum period payable under your Plan for these limited benefit
> conditions.  Therefore, your benefits are scheduled to end on
> September 16, 2013.  No additional benefits will be payable after
> September 16, 2013 and your disability claim will have been paid in
> full in accordance with the terms of your employer's disability plan.
>
> If you would like to reconsider your claim for benefits beyond
> September 16, 2013, please submit updated medical documentation
> to support a non-limited disabling condition to include but not be
> limited to office visit records, test results, diagnostic studies or any
> other clinical evidence that would support your continued disability as
> defined by the Plan.
>
> Because your claim was denied in whole or in part, you may appeal
> this decision . . . .
>
> In the event your appeal is denied in whole or in part, you will have
> the right to bring a civil action under Section 502(a) of the Employee
> Retirement Income Security Act of 1974.
>
> The plan may limit the period of time you may have in which to file a
> civil action.  Please refer to your plan document for information on
> the limitation period.

(AR 1521-22.)

On July 7, 2014, MetLife sent Plaintiff's counsel a follow-up letter to its July 1, 2014 fax, requesting additional information in order to determine Plaintiff's LTD appeal claim.  (AR 380.)  Specifically, it asked whether Plaintiff was treating with a physician for her right-hand tremors and whether testing had been performed to determine the etiology of the tremors.  (*Id.*)  Plaintiff responded that she was not treating with anyone for her tremors.  (AR 335.)

On August 8, 2014, MetLife upheld the termination of Plaintiff's claim for LTD benefits based on the conclusion that she had received the maximum amount of LTD benefits allowed under the Plan's mental or nervous disorder or disease limited benefit condition provision due to her diagnoses of PTSD, major depression, panic, and anxiety disorder.  (AR 367.)  The letter also stated:

> Based on Ms. Stupar's diagnoses of fibromyalgia, arthritis and chronic pain, the medical documentation did not support any of the exclusionary diagnoses under the Plan's neuromusculoskeletal and soft tissue disorder limited benefit condition provision such as seropositive arthritis; spinal tumors, malignancy, or vascular malformations; radiculopathies; myelopathies; traumatic spinal cord necrosis; or musculopathies. In addition, we further reviewed Ms. Stupar's file based on her non-limited benefit condition diagnoses of chronic renal insufficiency, tremors, hypertension, high cholesterol, headaches and insomnia; and determined that Ms. Stupar did not satisfy the Plan's definition of disability as she has not demonstrated that after the 24 month period, she was unable to earn more than 60% of her indexed predisability earnings from any employer in her local economy at any gainful occupation for which she was reasonably qualified taking into account her training, education, experience and predisability earnings beyond September 16, 2013.

(*Id.*)  In conclusion, the letter stated:

> Upon request, MetLife will provide Ms. Stupar with a copy of the documents, records, or other information that are relevant to her claim and identify any medical or vocational expert(s) whose advice was obtained in connection with her claim.  Ms. Stupar also has the right to bring civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.  The [P]lan may limit the period of time Ms. Stupar may have in which to file a civil action. Please refer to her employer's Plan document for information on the limitation period.

(AR 374.)

On September 10, 2014, Plaintiff retained the Law Office of Thomas M. Farrell, IV, P.A., to represent her in her LTD claim.[5]  (AR 361.)  The record contains a letter, sent by Plaintiff's counsel to MetLife via certified mail[6] on September 19, 2014, requesting a full and complete copy of the short term disability, long term disability, and group life insurance plans; any summary plan descriptions; a complete copy of the entire claims file; and an individual benefit statement.  (AR 359.)  On December 5, 2014, Plaintiff's counsel faxed and mailed a letter to MetLife, marked as "SECOND REQUEST," requesting the same documents as the September 19, 2014 letter.[7]  (AR 358.)

---

[5] Plaintiff was previously represented by J. Alfred Stanley, Jr.

[6] Mr. Farrell's Affidavit provides that the letter was sent via regular U.S. Mail, not certified mail.  (*See* Doc. 24 at 14.)

[7] Plaintiff alleges that, through counsel, she made two requests to Defendant and one request to the Plan Administrator for a copy of the Plan documents between September 18, 2014 and April 21, 2015.  (Doc. 1, ¶ 13.)

10

MetLife denies that it received any communication from Mr. Farrell's office until December 8, 2014, as reflected in MetLife's activity log.  (AR 351.)  On December 31, 2014, MetLife responded to Mr. Farrell's December 5, 2014 correspondence by enclosing a copy of Plaintiff's claim file, identifying the amount of the LTD monthly benefit at issue, and advising Plaintiff that requests for Plan documents should be directed to the Plan Administrator, The Kroger Co.  (AR 355.)  Plaintiff alleges that "[t]he Plan Administrator first produced a copy of the Plan to [her] on or about April 21, 2015, thereby placing [her] on notice of the Plan's provisions."  (Doc. 1, ¶ 14.)  Plaintiff filed this lawsuit on May 6, 2015.  (Doc. 1.)

## C.    Records Most Pertinent to the Issues in the Case

Plaintiff immigrated from Bosnia with her husband and three children in 1999.[8]  (*See, e.g.*, AR 504.)  On February 16, 2006, she donated her right kidney to her husband who was on dialysis at the time.  (AR 403, 511, 795, 797.)  Since the kidney operation, Plaintiff reported a number of physical and mental issues, including fibromyalgia, hypertension, hypercholesterolemia, arthritis, low functioning left kidney, depression, anxiety, PTSD, panic attacks, insomnia, bipolar disorder, headaches, and tremors.  (*See, e.g.*, AR 511-12.)

---

[8]  Plaintiff resided in Kentucky until 2011 when she moved to Jacksonville, Florida.  (AR 504.)

### 1.    Plaintiff's Treating Sources

### a.    Dr. Heidi M. Schaefer

On September 14, 2006, Dr. Heidi M. Schaefer, with Nephrology/Kidney Transplant, completed a Family and Medical Leave Act ("FMLA") form for Plaintiff.  (AR 795.)  Dr. Schaefer opined that Plaintiff would need to work only intermittently because of doctor's office visits every one to two months and as needed, to accommodate Plaintiff's condition as a kidney donor to her husband. (AR 795, 797.)  On April 3, 2007, Dr. Schaefer completed another FMLA form for Plaintiff, in which she opined that Plaintiff would need to escort her husband to office visits at least every two months and as needed, for six months due to his kidney transplant.  (AR 672, 674, 676.)  On June 26, 2007, Dr. Schaefer again completed an FMLA form for Plaintiff.  (AR 664.)  Dr. Schaefer opined that Plaintiff would need to work only intermittently on an ongoing basis as a result of her husband's kidney transplant.  (*Id.*)  She stated that Plaintiff would be absent from work for office visits every two months and more often as needed, for the rest of her husband's life.  (AR 666, 668.)  In a February 19, 2008 form, Dr. Schaefer again stated that Plaintiff could work only intermittently for life due to appointments every two months and as needed.  (AR 1293, 1295, 1297.)

### b.    Dr. Anthony Langone

On October 19, 2006, Dr. Anthony Langone, Assistant Professor of Medicine and Medical Director of Kidney Transplant at Nashville VA Hospital,

completed an FMLA form, releasing Plaintiff to work with the following indefinite restrictions: avoid all caustic chemicals as well as extreme hot and cold, and take frequent breaks to rest.  (AR. 743.)  On December 19, 2006, Dr. Langone wrote a letter to the Human Resources Manager at Plaintiff's bakery. (AR 683.)  The letter provided in relevant part:

> On December 12, 2006, I had Ms. Stupar for over 90 minutes in my office reviewing her medical history[,] performing a physical exam and reviewing her occupational history.  I believe that the patient has done well from the kidney donation standpoint and does not have medical issues in relation to that.  Her kidney function remains stable. . . . I truly believe, Ms. Stupar wishes to return to work where unfortunately she truly believes that her working sanitation is making her sick.  In particular the caustic chemicals that she uses to clean with, she feels makes [sic] her very short of breath and at times leads [sic] to coughing and pleuritic chest pain. . . . I ask that you work with Ms. Stupar in job retraining and allow her to be employed in a different facet of your bakery product production. . . . Unfortunately frequent bending, picking up items or bending on to ones [sic] knees will stretch her scar tissue and potentially create pain and discomfort when doing these activities. . . . [T]he focus of her current occupation should be her job does not require heavy or frequent lifting and minimal bending and kneeling.

(*Id.*)

On February 6, 2007, Dr. Langone released Plaintiff to work as of February 19, 2007 with no restrictions.  (AR 679.)  On October 2, 2007, he completed another FMLA form, in which he opined that Plaintiff would need to work only intermittently for a year due to appointments every two to four months and as needed because of her husband's kidney transplant.  (AR 641.)

On June 17, 2008, Dr. Langone noted that Plaintiff, as a kidney donor, was still being followed in the Kidney Transplant Clinic every two months and as needed, and that both she and her husband would need to be seen every two months and as needed, for life.  (AR 1278.)  He reiterated this on February 22, 2009 and October 9, 2009.  (AR 1221, 1181, 1183.)  On April 9, 2010, Dr. Langone again opined that Plaintiff could work only intermittently due to needed lifelong treatment every two months and as needed. (AR 1119, 1121.)

### c.    Dr. Karen Starr

On April 19, 2011, Dr. Karen Starr evaluated Plaintiff for depression subsequent to her mother's death on March 17, 2011, on referral by Dr. Langone. (AR 1038.)  Dr. Starr opined that Plaintiff was "not ready to return to work" and would be reassessed in a month following adjustments to her medications.  (AR 1038-39.)  On April 20, 2011, Dr. Starr opined that Plaintiff might possibly be released to work as of June 23, 2011.  (AR 1025, 1027.)

In a follow-up note from May 17, 2011, Dr. Starr stated:

Mrs. Stupar continues to be treated in my clinic for severe depression and post-traumatic stress disorder (late onset)[9] the effects of which have been severe and crippling as far as her ability to concentrate, process information, and focus.  She has severe tremors that are unrelenting and this also interferes with her work.

(AR 1790.)

_____

[9] Dr. Starr diagnosed Plaintiff with PTSD for the first time that day.  (AR 1790.)

14

On June 23, 2011, Dr. Starr diagnosed Plaintiff with organic mood disorder (severe) and PTSD (severe).  (AR 1794.)  On July 14, 2011, she noted that Plaintiff had a little more energy and did not feel as depressed.  (AR 1799.)  That day, Plaintiff also complained of intermittent low back and right side pain.  (*Id.*)

On August 25, 2011, Dr. Starr completed an Initial Functional Assessment Form for MetLife.  (AR 1778.)  She opined that Plaintiff had responded to treatment with mild improvement and frequent relapses.  (*Id.*)  She also opined that Plaintiff would be prohibited to return to her job for at least a year to eighteen months because she could not tolerate noise and people, and could not think clearly.  (AR 1779.)

On November 16, 2011, Dr. Starr diagnosed Plaintiff with PTSD and major depressive disorder, recurrent, severe, without psychotic features.  (AR 1508.)  On December 20, 2011, Plaintiff's diagnoses remained the same.  (AR 1504.)

In February 2012, Dr. Starr completed a Supplemental Functional Assessment Form for MetLife.  (AR 1711-12.)  Dr. Starr opined that Plaintiff's symptoms had impacted her ability to concentrate, focus, and exercise, and there had been little change as a result of treatment.  (AR 1711.)  She also opined that Plaintiff would be unable to perform her job as an icing operator due to multiple PTSD symptoms (*id.*), and assessed a number of severe and moderately severe restrictions (AR 1712).

15

### d.      UF Department of Psychiatry

On April 25, 2012, Plaintiff saw Julide Ozan, Physician Assistant, at UF

Department of Psychiatry, for "therapy secondary to PTSD symptoms incurred

during the war in her home country."  (AR 1500.)  Plaintiff complained of

nightmares, anxiety with hyper vigilance, and fearfulness when in public, and

experienced flashback-like memories when hearing loud noises.  (*Id.*)  Plaintiff

was "happy with her medications which were started when she was being treated

in Tennessee." (*Id.*)  Plaintiff's mood was "depressed and anxious with a

congruent affect."  (AR 1501.)  It was determined that Plaintiff would be

scheduled for individual cognitive behavioral therapy for PTSD with Brian Celso,

PhD.  (*Id.*)

On April 30, 2012, Dr. Celso saw Plaintiff for an initial psychotherapy

session for anxiety, depression, and PTSD.  (AR 1631.)  Her symptom severity

was moderate to severe.  (*Id.* )  A tremor was noted.  (*Id.*)  Dr. Celso's prognosis

for recovery was guarded to fair.  (AR 1632.)

On June 6, 2012, Dr. Celso saw Plaintiff for a follow-up session.  (AR

1633.)  Plaintiff reported headaches kept her up at night.  (*Id.*)  Her diagnoses

remained the same: major depressive disorder, recurrent, moderate, and PTSD.

(*Id.*)  Dr. Celso noted that Plaintiff's response to intervention was good.  (AR

1634.)  On July 6, 2012, Dr. Celso stated that Plaintiff showed slow progress

toward improving her level of functioning.  (AR 1636.)

16

On July 31, 2012, Plaintiff saw Leslie Rosenberg, ARNP in place of Julide Ozan.  (AR 1498.)  She reported that therapy was helping.  (*Id.*)  She had a slight tremor in her right hand.  (AR 1499.)  She was diagnosed with major depressive disorder, moderate, recurrent; PTSD, chronic; and anxiety disorder, NOS.  (*Id.*)

On August 22, 2012, Dr. Celso completed a Psychiatric Questionnaire in response to MetLife's request.  (AR 1628.)  He opined that anxiety and depression impaired Plaintiff's concentration and focus, and that she was nervous in public, preoccupied with personal problems, had short attention span, and avoided strangers.  (*Id.*)  He further opined that Plaintiff could slowly resume normal routine, but should avoid novel situations that require rapid decision-making and quick reaction time, and return to only part-time work for a period of six months.  (AR 1629.)  Dr. Celso also opined that Plaintiff was moderately limited in performing intellectually complex tasks, in generalizing, evaluating, and making decisions without immediate supervision, in making independent judgment, supervising others, and performing under stress or in situations where working speed and sustained attention are fundamental to the job.  (AR 1630.)

On October 9, 2012, Plaintiff reported to Ms. Rosenberg that she was still depressed "but a little better."  (AR 1496.)  She still had a slight tremor in her right hand.  (*Id.*)  On January 17, 2013, Plaintiff saw Ms. Rosenberg again and complained that she was not sleeping.  (AR 1494.)  Her diagnoses remained the same and she was sad and tearful with anxious and depressed mood.  (*Id.*)  On

17

March 14, 2013, Plaintiff complained to Ms. Rosenberg again that she was not sleeping and was waking up with headaches.  (AR 1492.)  She still had right-hand tremors.  (*Id.*)  Her mood was mildly depressed and anxious.  (*Id.*)

On April 22, 2013, Ms. Rosenberg completed a Behavioral Health Supplemental Functional Assessment Form in response to MetLife's request. (AR 1579.)  In that form, she opined that Plaintiff could work part-time in a low stress environment.  (*Id.*)  She also opined that Plaintiff had a moderately severe impairment in the ability to perform intellectually complex tasks and supervise others, and a moderate impairment in the ability to maintain appropriate control of emotions, comprehend and follow instructions, and handle goals, objectives, and performance measurements, among others.  (AR 1580.)

On May 23, 2013, Plaintiff was tearful, shaking, and depressed when she saw Ms. Rosenberg.  (AR 1490.)  Ms. Rosenberg noted: "She was upset because I completed paper work and stated she could possibly work part time.  She is adamant that she can not work now and will never be able to work. 'I can not be around people.'" (*Id.*)  Plaintiff's diagnoses remained the same, except her depression was mild to moderate, and she continued to have a mild tremor in her right hand.  (*Id.*)

On June 4, 2013, Ms. Rosenberg completed a form sent by MetLife addressing Plaintiff's return to work potential in an eight-hour work day.  (AR 1558.)  She opined that Plaintiff could, with accommodations, comprehend and

18

follow simple instructions and perform simple and routine tasks.  (*Id.*)  She further opined, however, that Plaintiff could not, *inter alia*, maintain a work pace appropriate to a workload, maintain appropriate control of emotions, interact with customers and peers, and interact and respond appropriately to supervision.  (*Id.*)

On July 11, 2013, Plaintiff's diagnoses and right-hand tremor remained the same.  (AR 1488.)  She was tearful, moderately depressed, and anxious.  (*Id.*)  On July 24, 2013, Plaintiff showed up with her daughter at Ms. Rosenberg's office for an unscheduled appointment.  (AR 1486.)  She "had uncontrollable crying" and stated twice, "I am going home and open up my pill bottle and drink all of my pills."  (*Id.*)  Plaintiff was diagnosed with major depressive disorder, severe, recurrent; PTSD, chronic; and anxiety disorder, NOS.  (AR 1487.)  Ms. Rosenberg noted: "Because of the suicidal ideations with a plan, the decision was made to Baker Act the patient and send her to the hospital for psychiatric admission."  (AR 1486.)  Plaintiff was sent to Shands via ambulance.  (AR 1487.)

A note from Shands dated July 25, 2013 indicates that Plaintiff was admitted there, but discharged to her family because she did not meet Baker Act criteria.  (AR. 1477.)  The note also stated: "Keeping her here against her will is not going to be fruitful but rather traumatize her more.  She is depressed over the loss of her mother and physical conditions.  She is very clear.  She is more stressed because of the nurse practitioner who Baker Acted her."  (*Id.*)

### e.      Shands Neurosurgery

A July 6, 2012 note from Shands Neurosurgery shows that Plaintiff

underwent electrodiagnostic evaluation of her right leg, which was normal.  (AR

1515-16.)  She complained of numbness in her right foot, a needle-like feeling in

her wrist and arms, and pain in the entire right leg and the lower back.  (AR

1515.)  Her sensory exam showed:

> [R]educed light touch on the [right] dorsal and medial foot and some
> paresthesias on the [right] lateral foot.  Light touch was diffusely
> reduced throughout the entire [right] leg, most prominently
> posteriorly, and diffusely reduced in the [right] thigh.  Light touch was
> also reduced in the [right] face, arm, leg, and trunk as was pinprick.
> Reflexes were 2 at the knees and at the ankles, and the plantar
> responses were downgoing.

(AR 1516.)  Dr. Michael T. Pulley's impression was as follows:

> The electrophysiologic study was normal with no evidence to indicate
> that there was a peripheral nerve or nerve root abnormality as the
> etiology of her leg symptoms.  A negative study would not exclude
> the possibility of mild radiculopathy that is not causing motor axon
> loss.  I would recommend conservative management of this and
> consider a trial of a tricyclic antidepressant . . . .

(*Id.*)

### 2.      Other Evidence

### a.      Dr. Allison Keiter

On May 21, 2012, Plaintiff was evaluated by psychologist Allison Keiter in

connection with her Social Security Disability claim.  (AR 1480.)  Plaintiff was

diagnosed with PTSD, panic attacks without agoraphobia, and major depressive

disorder without psychotic features.  (AR 1483.)  Dr. Keiter's Medical Source

Statement ("MSS") provides:

> Vocationally the claimant is able to follow and understand simple
> directions and instructions.  She is able to perform simple tasks
> independently, but may have some difficulties performing more
> complex tasks.  She is able to maintain attention, concentration, and
> a regular schedule.  She is able to learn simple new tasks.  She is
> able to make appropriate decisions, but may struggle to interact
> adequately with others.  She is able to appropriately deal with stress.

(*Id.*)

### b.    Dr. Susana Barsky

On November 1, 2013, in connection with Plaintiff's Social Security

Disability claim, Susana Barsky, PsyD performed a general clinical evaluation

with mental status, the results of which were reported on November 6, 2013.  (AR

504.)  She observed, *inter alia*, that Plaintiff's "hands trembled," she cried during

the interview, and "[h]er motor behavior was restless secondary to anxiety and

emotional distress."  (AR 506.)  Plaintiff "reportedly experience[d] panic attacks in

the form of palpitations, trembling, chest pain, difficulty breathing, and sweating."

(AR 505.)  Plaintiff's "thought process was obsessive in nature, as she

perseverated on negative content," her "affect was agitated," her "mood was

dysthymic and dysphoric," her "attention and concentration were impaired, as

evidenced by her difficulty remaining focused on topic and her tendency to

perseverate on negative content," her "recent and remote memory skills were

impaired secondary to emotional distress," and her insight and judgment were

fair.  (AR 506.)

Dr. Barsky's MSS provides:

> The Claimant appears able to follow and understand simple
> directions and instructions; she appears mildly limited in her ability to
> perform simple tasks independently; she appears limited in her ability
> to maintain attention and concentration; she appears limited in her
> ability to maintain a regular schedule; she is limited in her ability to
> learn new tasks; she appears very limited in her ability to complete
> more complex tasks independently.  She appears very limited in her
> ability to relate to others adequately.  She appears limited in her
> capacity to make appropriate decisions and is unable to deal with
> stress appropriately.

(AR 507.)

Dr. Barsky diagnosed Plaintiff with panic disorder with agoraphobia, major

depressive disorder without psychotic features, kidney dysfunction, fibromyalgia,

hypertension, high cholesterol, and chronic pain.  (*Id.*)  She recommended that

Plaintiff "undergo a full psychiatric evaluation . . . [and] attend ongoing

psychological treatment to assist in developing effective coping skills in order to

more effectively deal with stressors and medical conditions."  (*Id.*)  Her prognosis

was fair to guarded given Plaintiff's "extensive medical conditions and limitations

in language."  (*Id.*)

Dr. Barsky also completed a Medical Source Statement of Ability to Do

Work-Related Activities (Mental) on November 6, 2013.  (AR 508.)  She assessed

a number of moderate and marked limitations, including marked limitations in the

ability to make judgments on both simple and complex work-related decisions, in

the ability to understand, remember, and carry out complex instructions, in the

ability to interact appropriately with the public, supervisors, and co-workers, and

in the ability to respond appropriately to usual work situations and to changes in a

routine work setting.  (AR 508-09.)

### c.     Dr. Maureen O'Brien

On November 4, 2013, Dr. Maureen O'Brien, an urgent care physician,

performed an internal medicine examination of Plaintiff at the request of the

Division of Disability Determination.  (AR 511.)  In summarizing Plaintiff's medical

history, Dr. O'Brien stated:

> The claimant has a history of fibromyalgia since 2007.  She reports
> that every morning she rises from bed and has pain in every part of
> her body, especially her legs and feet.  She has pain throughout the
> day.  She has numbness in her feet and her legs, and she suffers
> from ankle and knee pain.  She describes the pain as 8/10, it
> radiates throughout her entire body.  She has nothing that alleviates
> it, but she does note that as she moves throughout the day, it does
> improve.
> The claimant also suffers from headaches since 2007, which are
> especially severe, and she has them every day.  Sometimes they are
> so severe she needs to lay down. . . .
> The claimant has a history of high blood pressure since 2007 and
> cholesterol since 2007 which apparently are stable.
> The claimant also has a history of chronic kidney disease.  She was
> told that the remaining kidney that she has after her donation is only
> functioning at half of capacity. . . .
> The claimant has a history of depression, anxiety, panic attacks,
> insomnia, PSD [sic], and bipolar.  She admits to being delusional at
> times and she experiences some hallucinations.

(AR 511-12.)

On examination:

> The claimant [sic] affect was anxious and tearful.  Her gait was
> normal.  She stated she cannot walk on her heels or toes.  She
> stated she cannot squat.  She has a normal stance and she used no
> assistive devices.  Needed no help changing for exam or getting on
> and off exam table.  Able to rise from chair without difficulty.

(AR 513.)  Plaintiff showed decreased range of motion in her cervical and lumbar

spine, hips, knees, and ankles bilaterally, and her strength in the upper and lower

extremities was a four out of five.  (AR 514.)  As reflected on the Fibromyalgia

Report, all boxes were checked for positive tender points.  (AR 525.)

Dr. O'Brien was unable to test fine motor activity because Plaintiff "had a

severe tremor in her right hand."  (AR 514.)  She explained: "The tremor does not

appear to get worse as far as an intentional tremor.  Grip strength 3/5 bilaterally.

She could not even attempt to do a button because her right hand tremored so

significantly.  Confirm 3/5 strength of left hand."  (*Id.*)

Plaintiff's mental status screening showed in relevant part:

> She was not showing any evidence of hallucinations; however, there
> did seem to be some evidence of delusions. . . .  She did show some
> evidence of some significant memory impairment.  Affect was off,
> she was very tearful and seems afraid.

(AR 514-15.)

Among other findings, Dr. O'Brien diagnosed Plaintiff with severe

depression with low energy and weight loss, fibromyalgia, hypertension,

headaches, arthritis, and panic attacks.  (AR 515.)  In the MSS, Dr. O'Brien

stated: "The claimant has marked limitations with performing fine motor activity using the right hand.  The claimant has marked limitations with prolonged standing, walking, squatting, bending, lifting, carrying, reaching, pushing and pulling."  (*Id.*)  Her prognosis was poor.  (*Id.*)

The same day, Dr. O'Brien completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  (AR 519.)  Dr. O'Brien opined that Plaintiff could never lift and/or carry any amount of weight; could never reach, handle, finger, feel, and push/pull with the right hand; could never operate foot controls, climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, crawl; could never be exposed to unprotected heights, humidity, dust, extreme temperatures, noise, etc.; could sit/stand/walk for 30 minutes each at a time and two hours each in an eight-hour workday; and would require the use of a cane to ambulate.  (AR 519-23.)  Dr. O'Brien opined that based on Plaintiff's physical impairments, she could not shop, travel without a companion, use public transportation, prepare a simple meal, and sort, handle, or use paper/files.  (AR 524.)

### d.    Dr. Mimi Thein

On May 6, 2014, Dr. Mimi Thein, Board Certified in Adult Psychiatry and Child and Adolescent Psychiatry, submitted a report following her peer review of

Plaintiff's file.[10]  (AR 410.)  Dr. Thein was "unable to determine continuous

psychiatric functional limitations based upon a singular office visit with Dr. Barsky

on 11/1/13 and a singular office visit with Dr. O'Brien on 11/4/13."  (AR 416.)  Dr.

Thein stated:

> Dr. Barsky did recommend a full psychiatric evaluation and further
> mental health follow-up evaluations – which are not observed in the
> available medical documentation. . . .
> Given that no follow-up or psychiatric evaluations are available
> beyond 11/1/13, given that follow-up Nephrology Clinic evaluations
> on 11/12/13 and 2/18/13 revealed "no acute distress," this writer
> opines that the provided medical documentation does not support
> psychiatric functional limitations, restrictions, treatment, or
> complications during the period beyond 9/16/13.

(*Id.*)  Further, Dr. Thein opined that "the medical documentation available [did] not

support evidence of the claimant to be experiencing schizophrenia, dementia,

organic brain disease, or bipolar disorder on or around 9/16/13." (*Id.*)  Lastly, Dr.

Thein opined that given that Plaintiff was "not receiving any on-going mental

health evaluation, treatment, etc. beyond 9/16/13 – based upon the medical

documentation available," she "was not adherent with her providers' treatment

plans (e.g., Dr. Barsky recommended a psychiatric follow-up and ongoing

appointments on 11/1/13 and the Nephrology Clinic noted on 2/18/14 ov and

11/12/13 ov that the claimant is being followed by psychiatry)."  (AR 417.)

---

[10] As part of the file review, Dr. Thein noted the references to Plaintiff's tremors
in the records from Dr. Barsky, Dr. Starr, and the UF Department of Psychiatry.  (See
AR 411 (trembling), 413 (right hand tremors), 414 (shakiness), 415 (hands trembled
and motor behavior was restless secondary to anxiety and emotional distress), 416
(trembles too much to concentrate on cooking; hands tremble too much).)

#### e.    Dr. Christopher Cosgrove

On May 15, 2014, Dr. Christopher Cosgrove, Board Certified in Nephrology

and Internal Medicine, prepared a peer review report assessing Plaintiff's

functional restrictions and limitations based on her chronic kidney disease.  (AR

402-03.)  Dr. Cosgrove reviewed and summarized Plaintiff's chart before and

after her "successful living kidney donation to her husband on February 16, 2006,

at Vanderbilt University Medical Center."  (AR 403.)  He then opined:

> Based upon the claimant's history of stage III chronic kidney disease
> occurring as a consequence of previous donor nephrectomy and
> hypertension, she has no functional limitations.  Dr. Maureen
> O'Brien, in her note of November 4, 2013 as part of the claimant's
> disability evaluation, concluded the patient had significant physical
> restrictions related to tremors in her right hand.  However, in no other
> note within her chart, including a psychiatrist note on the same day,
> is mention made of similar limitations of the patient.  The claimant is
> diagnosed with major depressive disorder, agorophobia [sic] and late
> onset posttraumatic stress disorder and would require the opinion of
> a psychiatrist regarding limitations which arise as a consequence of
> these diagnoses.  Her primary complaints are of fatigue, weakness
> and an inability to perform anything but her own activities of daily
> living.
> However, related to her medical issues, specifically her chronic
> kidney disease and hypertension, the claimant has no limitations.
> The claimant's chronic kidney disease is Stage III, which is an
> asymptomatic stage, and her hypertension is well controlled and
> therefore asymptomatic as well.

(AR 407.)

On June 11, 2014, Dr. Cosgrove responded to MetLife's request for

clarification regarding his peer review of Plaintiff's records performed on May 15,

2014.  (AR 383.)  He opined that "[w]ithin the medical record there is no evidence

27

of seropositive arthritis, spinal tumors, malignancy, neurovascular malformations,

nor evidence of radiculopathies, myelopathies, traumatic spinal cord necrosis, or

musculopathies."  (AR 384.)  With respect to Plaintiff's right-hand tremor, Dr.

Cosgrove stated:

> The claimant is noted to have a tremor involving her right hand, which in all save one examination by Dr. Maureen O'Brien, is described as a mild tremor involving her right hand.  In Dr. O'Brien's evaluation on November 6, 2013, the tremor is noted to be of such in severity [sic] that the claimant is unable to perform fine motor skills such as buttoning buttons.  However, [in] an additional examination performed [by] Susana Barsky on November 6, 2013, no mention is made of this tremor.  Within the medical record there is no objective evidence for the cause of this tremor[.]

(*Id.*)

Then, in response to the question whether the medical information

supported physical functional limitations beyond September 16, 2013, Dr.

Cosgrove stated:

> Yes.  The available medical record does indicate that the claimant would be unable to perform fine motor skills with her right hand.  She also would be unable to pick up items heavier than 10 pounds with her right hand.  This opinion differs from my previous report, as I was instructed to address any restrictions solely related to her chronic kidney disease.  Otherwise, the claimant would have no restrictions related to her chronic renal insufficiency, hypertension, hypercholesterolemia, arthritis, headaches, chronic pain, fibromyalgia, substance abuse or insomnia.  The claimant does have major depression and post-traumatic stress disorder, a diagnosis to which I cannot attest expertise to assess any functional limitations.

(AR 385.)  The evidence that supported the above functional limitations included

"Dr. O'Brien's physical examination note of November 6, 2013, in which she

28

documents severe tremor involving the claimant's right hand" and Dr. Cosgrove's dictation from May 2014.  (*Id.*)

### f.    Defendant's Appeals Specialists

In June 2014, Plaintiff's file was referred to Defendant's Appeals Vocational Rehabilitation Counselor ("VRC") Susan Sineni.  (AR 319.)  Ms. Sineni opined that Plaintiff had a "solid singular unskilled/semi skilled light-medium work history at the employer; however, with the restrictions [assessed by Dr. Cosgrove], high school education in Bosnia, and gainful wage," she was "unable to identify appropriate, gainful occupations for which [Plaintiff] would qualify in either of her labor markets."  (AR 326, 328-30.)

On August 6, 2014, Defendant's appeals specialist stated that although Dr. Cosgrove assessed restrictions due to Plaintiff's hand tremors, the "psych [Independent Physician Consultant ("IPC")] report"[11] indicated that the tremors were caused by Plaintiff's anxiety.  (AR 337-38.)  Deciding that the tremors were caused by Plaintiff's anxiety, the appeals specialist concluded that Plaintiff had already received the maximum amount of benefits due to mental/nervous conditions.  (AR 338.)

---

[11] Defendant's specialist is apparently referring to Dr. Thein's report.  (*See* Doc. 25 at 4.)

III.    **Standard of Review**

A.    **Summary Judgment Standard**[12]

Summary judgment is proper when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  "In an ERISA benefit denial case . . . in a very real sense, the

district court sits more as an appellate tribunal than as a trial court.  It does not

take evidence, but, rather, evaluates the reasonableness of an administrative

determination in light of the record compiled before the plan fiduciary."  *Curran v.*

*Kemper Nat'l Servs., Inc.*, Case No.: 01-14097, 2005 WL 894840 at *7 (11th Cir.

Mar. 16, 2005) (per curiam) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18

(1st Cir. 2002)).  *Accord Clark v. Hartford Life & Accident Ins. Co.*, Case No.:

8:05-cv-67-T-23MAP, 2006 WL 890660 at *2 (M.D. Fla. Apr. 6, 2006).

"[W]here the decision to grant or deny benefits is reviewed for abuse of

discretion, a motion for summary judgment is merely the conduit to bring the legal

question before the district court and the usual tests of summary judgment, such

---

[12] Each party moves for entry of summary judgment in its favor.  However, Defendant's request for summary judgment is an alternative request for relief in case Defendant's Motion is not decided pursuant to Fed.R.Civ.P. 52.  As "the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply" when a decision is reviewed for abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court." *Crume v. Metropolitan Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006).  With these principles in mind, the undersigned will address the parties' Motions for Summary Judgment.

as whether a genuine dispute of material fact exist, do not apply."  *Crume*, 417 F.

Supp. 2d at 1272.  As explained in *Crume*:

> In a case like this, where the ultimate issue to be determined is
> whether there is a reasonable basis for a claims administrator's
> benefits decision, it is difficult to ascertain how the "normal" summary
> judgment rules can sensibly apply.  After all, the pertinent question is
> not whether the claimant is truly disabled, but whether there is a
> reasonable basis in the record to support the administrator's decision
> on that point.  In other words, conflicting evidence on the question of
> disability cannot alone create an issue of fact precluding summary
> judgment, since an administrator's decision that rejects certain
> evidence and credits conflicting proof may nevertheless be
> reasonable.

*Id.* at 1273.

## B.    ERISA Standard of Review

ERISA authorizes a plan participant or beneficiary "to recover benefits due

to [her] under the terms of [the] plan, to enforce [her] rights under the terms of the

plan, or to clarify [her] rights to future benefits under the terms of the plan."  29

U.S.C. § 1132(a)(1)(B).  A claimant suing under this provision bears the burden of

proving her entitlement to contractual benefits; however, if an insurer claims that

a specific policy exclusion applies to deny the insured benefits, then the insurer

must generally prove the exclusion prevents coverage.  *See Horton v. Reliance

Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v.

Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)).  Nevertheless,

where at issue is a limitation provision merely limiting the amount of benefits that

may be received once a claim is granted, rather than an entire exclusion from

31

benefits, the burden of proof remains with the claimant.  *Aleksiev v. Metropolitan Life Ins. Co.*, 2012 U.S. Dist. LEXIS 183417, *38-39 (N.D. Ga. Mar. 9, 2012) (citing *Doe v. Hartford Life & Accident Ins. Co.*, 2008 U.S. Dist. LEXIS 103524, *12-13 n.1 (D.N.J. Dec. 22, 2008)).

> ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries.  However, the Supreme Court in *Firestone* [*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989),] established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest.

*Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citations omitted).

In the Eleventh Circuit, the *Firestone* test was expanded into a six-step analysis:

1.      Was the administrator's decision wrong, i.e., does the Court disagree with the decision under a *de novo* standard of review?

2.      If the Court disagrees with the administrator's decision, was the administrator vested with discretion under the ERISA Plan in reviewing claims?

3.      If the administrator had discretion, was its decision arbitrary and capricious,[13] i.e., lacking reasonable grounds?

---

[13] In ERISA, the terms "arbitrary and capricious" and "abuse of discretion" are used interchangeably.  *Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 976 (11th Cir. Oct. 8, 2008).

4.      If there were reasonable grounds for the decision, was the administrator acting under a conflict of interest?

5.      Assuming no conflict of interest, the decision should be affirmed.

6.      If there was a conflict of interest, review the decision under the heightened arbitrary and capricious standard.

*See id.*

However, the Eleventh Circuit recognized that *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105 (2008), implicitly overruled the heightened arbitrary and capricious standard in step six above, by clarifying that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious."  *Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352, 1360 (11th Cir. 2008).  Further, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."  *Id.*

"If the *de novo* standard applies, a district court reviewing a benefits determination 'is not limited to the facts available to the Administrator at the time of the determination.'" *Crume*, 417 F. Supp. 2d at 1271.  "[I]f the arbitrary and capricious standard applies, 'the administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered.'" *Id.*

33

Here, it appears undisputed that Defendant was vested with sufficient discretion under the Plan to trigger the deferential arbitrary and capricious standard.  *See id.* (stating that this court has applied the arbitrary and capricious standard when the plan provides that the administrator's "determinations shall be final and conclusive" so long as they are "reasonable determinations which are not arbitrary and capricious").  Thus, even if the Court determines that Defendant's decision was *de novo* wrong, it should still be upheld so long as there was a reasonable basis for the decision "based upon the facts as known to the administrator at the time the decision was made."  *Townsend*, 295 F. App'x at 976.  "If the 'evidence is close,' then the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision."  *Richey v. Hartford Life & Accident Ins. Co.*, 608 F. Supp. 2d 1306, 1310 (M.D. Fla. 2009).

## IV.   Analysis

Plaintiff challenges Defendant's August 8, 2014 decision, which upheld the termination of her LTD benefits after concluding that Plaintiff had received the maximum amount of benefits under the Plan's 24-month lifetime limitation for mental or nervous disorder or disease due to her diagnoses of PTSD, major depression, panic, and anxiety disorder, and that there was no evidence of schizophrenia, bipolar disorder, dementia, or organic brain disease beyond September 16, 2013.  (AR 367.)  At that time, Defendant also determined that

with respect to Plaintiff's diagnoses of fibromyalgia, arthritis, and chronic pain, which were subject to the Plan's 24-month lifetime limitation for neuromusculoskeletal and soft tissue disorder, the medical evidence did not support that any of the exceptions to this limitation would apply, such as seropositive arthritis, spinal tumors, malignancy, or vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis, or masculopathies. (*Id.*)  Finally, with respect to Plaintiff's diagnoses of chronic renal insufficiency, tremors, hypertension, high cholesterol, headaches, and insomnia, Defendant determined that Plaintiff failed to demonstrate that after the 24-month period she was unable to earn more than 60% of her indexed predisability earnings from any employer in her local economy at any gainful occupation for which she was reasonably qualified, and, therefore, she was not disabled under the Plan beyond September 16, 2013.  (*Id.*)

Plaintiff states that "no issue exists as to application of the Plan's 24 month 'Mental or Nervous Disorder or Disease' limitation" because she does not contend that she is disabled due to a psychiatric condition.[14]  (Doc. 19 at 11-12.)

---

[14] In response, Defendant states: "Even though both parties agree that Plaintiff is not entitled to additional LTD benefits because of her mental/nervous condition, it is important to note that Plaintiff's failure to submit sufficient evidence of an on-going psychiatric disability because of her failure to receive appropriate care and treatment for that condition does not equate to a resolution of that condition."  (Doc. 25 at 5.)  In light of the parties' representations, the Court need not discuss whether Defendant's decision with respect to Plaintiff's diagnoses of PTSD, major depression, panic, and anxiety disorder, is wrong, arbitrary, or capricious.  However, Defendant correctly notes that after September 16, 2013, the record does not show Plaintiff has received

Plaintiff also does not seem to challenge Defendant's determination with respect to her diagnoses of fibromyalgia, arthritis, chronic pain, chronic renal insufficiency, hypertension, high cholesterol, headaches, and insomnia.  Plaintiff challenges, however, Defendant's decision with respect to her right hand tremors.

Plaintiff argues that Defendant's decision to terminate her LTD benefits after September 16, 2013 was "wrong, arbitrary, and capricious because Defendant engaged in a clear pattern of seizing upon medical evidence that tended to support a denial of benefits, while ignoring evidence, much of which came from Defendant's own medical and vocational experts, that tended to support payment of benefits."  (*Id.* at 12.)  Specifically, Plaintiff argues that although Defendant initially adopted Dr. Cosgrove's opinion regarding her tremors, after the VRC determined that Dr. Cosgrove's restrictions would render Plaintiff unemployable, Defendant decided to ignore Dr. Cosgrove's restrictions based on Dr. Thein's report, which allegedly concluded that the tremors were psychiatric in nature.  (*Id.* at 12-13.)  Plaintiff points out that Dr. Thein did not expressly opine that the tremors were caused by anxiety; rather, she only

---

appropriate care and treatment for her mental conditions, proof of which is required in order to receive benefits under the Plan.  (Doc. 1-1 at 16.)  Therefore, it appears that Defendant's decision in this respect was correct.  *See Papczynski v. Conn. Gen. Life Ins. Co.*, 730 F. Supp. 410, 414 (M.D. Fla. 1990) ("In accordance with the terms of the policy, no benefits are due the insured during any period of disability in which the employee-insured is not under the care of a physician.").

concluded that Plaintiff did not have any psychiatric functional restrictions.  (*Id.* at 13.)

Defendant responds that under either a *de novo* or arbitrary and capricious standard, Plaintiff has not satisfied her burden to show that she is entitled to continuing LTD benefits under the Plan.  Defendant contends Plaintiff has failed to provide any medical documentation showing whether the etiology of her right hand tremors is physical or mental/nervous in nature or that she received any medical treatment therefor.  (Doc. 25 at 6, 10.)  Defendant also argues that just like with her physical conditions that were not subject to the 24-month limitation under the Plan, Plaintiff has failed to provide documentation that her tremors were severe enough to disable her from any gainful occupation.  (*Id.* at 6.)  To the extent MetLife has determined that Plaintiff's tremors were mental/nervous in nature, it argues that such determination was based on substantial evidence, including the opinions of Dr. Thein, Dr. Barsky, and Dr. Cosgrove.  (*Id.* at 7-9.)

The undersigned finds that Plaintiff has not satisfied her burden to prove that Defendant's decision to terminate her benefits after September 16, 2013 was wrong.  In its final decision upholding the termination of Plaintiff's LTD benefits, Defendant stated in relevant part:

> Based on the restrictions and limitations due to Ms. Stupar's right hand tremors provided by the IPC in nephrology and internal medicine, we requested that you provide our office with additional medical information pertaining to Ms. Stupar's right hand tremors such as the name and contact information of the treating physician,

as well as the medical records including any test results.  On July 30, 2014, we confirmed with your office that Ms. Stupar was not being treated by a physician due to her tremors.

(AR 372.)  The same letter provided:

> [T]he IPC further opined that based on Ms. Stupar's reported right hand tremors, . . . the medical documentation would support physical functional restrictions and limitations.  However, although the IPC in nephrology and internal medicine opined that the medical documentation supported continuous restrictions and limitations due to Ms. Stupar's right hand tremors, the psychiatric IPC report also noted the right hand tremors, but indicated that the tremors were caused from [sic] Ms. Stupar's anxiety.  Therefore, as the tremors are caused by Ms. Stupar's anxiety, based on Ms. Stupar's psychiatric conditions, MetLife determined, as noted above, that Ms. Stupar has already received the maximum amount of LTD benefits due to the mental or nervous disorder or disease limited benefit provision under her employer's Plan.

(AR 373.)  Defendant concluded that with respect to Plaintiff's tremors, among other conditions, Plaintiff had failed to demonstrate that after the 24-month period she was unable to earn more than 60% of her indexed predisability earnings from any employer in her local economy at any gainful occupation for which she was reasonably qualified beyond September 16, 2013.  (AR 367.)

The record in this case supports Defendant's decision.  In May 2011, Dr. Starr noted "severe tremors that are unrelenting and this also interferes with [Plaintiff's] work."  (AR 1790.)  In April 2012, Dr. Celso noted a tremor during Plaintiff's initial psychotherapy session.  (AR 1631.)  In July and October of 2012, Ms. Rosenberg also observed a slight tremor in Plaintiff's right hand.  (AR 1496,

1499.)  In March 2013, Ms. Rosenberg noted that Plaintiff still had right hand tremors.  (AR 1492.)  In May 2013, Ms. Rosenberg observed that Plaintiff was "shaking" and continued to have a mild tremor in her right hand.  (AR 1490.)  In July 2013, Plaintiff's tremor remained the same.  (AR 1488.)  In November 2013, Dr. Barsky observed that Plaintiff's "hands trembled," "[h]er motor behavior was restless secondary to anxiety and emotional distress," and her reported panic attacks manifested in the form of trembling, palpitations, etc.  (AR 505-06.)  Also in November 2013, Dr. O'Brien noted that she could not test for fine motor activity because Plaintiff had "a severe tremor in her right hand," which did "not appear to get worse as far as an intentional tremor," and that Plaintiff "could not even attempt to do a button because her right hand tremored so significantly."  (AR 514.)  Dr. O'Brien assessed "marked limitations with performing fine motor activity using the right hand" and opined, *inter alia*, that Plaintiff could never reach, handle, finger, feel, and push/pull with the right hand, as well as sort, handle, or use paper/files due to her physical impairments.  (AR 515, 519-24.)  In May 2014, Dr. Cosgrove noted that although in November 2013, Dr. O'Brien assessed significant physical restrictions related to Plaintiff's right hand tremors, "in no other note within her chart, including a psychiatrist note on the same day, is mention made of similar limitations of the patient."  (AR 407.)  In June 2014, Dr. Cosgrove opined, in light of Dr. O'Brien's November 6, 2013 examination note documenting a severe tremor in Plaintiff's right hand, that Plaintiff "would be

unable to perform fine motor skills with her right hand" and "would be unable to pick up items heavier than 10 pounds with her right hand." (AR 385.) Dr. Cosgrove stated, however, that "no mention is made of this tremor" in Dr. Barsky's November 6, 2013 examination note and that "[w]ithin the medical record there is no objective evidence for the cause of this tremor." (AR 384.)

As shown above, Plaintiff's medical providers, examiners, and peer file reviewers have noted that Plaintiff at times had a tremor in her right hand, but Plaintiff admittedly has not received any treatment for this tremor and has undergone no tests to determine its etiology. (AR 335.) Without a showing that Plaintiff was under the appropriate care and treatment from a doctor on a continuing basis for her condition, Plaintiff was not entitled to receive benefits under the Plan. (*See* Doc. 1-1 at 16.)

Plaintiff appears to challenge Defendant's determination that her tremors were mental/nervous in nature and, thus, subject to the 24-month lifetime limitation for mental or nervous disorder or disease. However, Plaintiff has not presented any evidence as to the etiology of her tremors and did not treat with any medical provider therefor. Based on the available evidence, it was not wrong for Defendant to infer that the tremors were likely mental in nature. For example, at the November 1, 2013 mental status evaluation, Dr. Barsky observed that Plaintiff's "hands trembled," "[h]er motor behavior was restless secondary to anxiety and emotional distress," and her reported panic attacks manifested in the

form of trembling, palpitations, etc.  (AR 505-06.)  Although Dr. Barsky did not

mention the tremor anywhere else in her November 6, 2013 report, she

recommended that Plaintiff "undergo a full psychiatric evaluation . . . [and] attend

ongoing psychological treatment."  (AR 507.)  Further, although Dr. O'Brien noted

a severe tremor in Plaintiff's right hand and assessed "marked limitations with

performing fine motor activity using the right hand," Dr. O'Brien did not state

whether the tremor was physical or mental in nature.[15]  (AR 514.)  In addition,

although Dr. Cosgrove stated that in light of Dr. O'Brien's examination note

documenting a severe tremor, Plaintiff would be unable to perform fine motor

skills or pick up items heavier than ten pounds with her right hand, Dr. Cosgrove

did not express an opinion on the cause of the tremor and indeed stated that

"there is no objective evidence for the cause of this tremor."  (AR 384-85.)

Finally, after a review of Plaintiff's file, which included references to Plaintiff's right

hand tremors, shakiness, and restless motor behavior secondary to anxiety and

emotional distress, Dr. Thein opined that the "medical documentation did not

support psychiatric functional limitations, restrictions, treatment, or complications

during the period beyond 9/16/13."  (AR 416.)

---

[15] Dr. O'Brien restricted Plaintiff's sorting, handling, or using paper/files based on her physical impairments.  (AR 524.)  Even assuming that Dr. O'Brien considered Plaintiff's tremor to be physical in nature, for which there is no indication, Defendant's decision, even if *de novo* wrong, should be upheld under the arbitrary and capricious standard for the reasons stated herein.

Based on the foregoing, it was not wrong for Defendant to infer that

Plaintiff's tremor was likely mental/nervous in nature.  Even assuming that the

evidence was insufficient to make a determination on this issue, it was Plaintiff's

burden to present medical evidence in support of her claim, as required by the

Plan.[16]  (Doc. 1-1 at 16 (stating that in order to receive benefits under the Plan, a

claimant must provide, *inter alia*, proof of disability, evidence of continuing

disability, and proof that the employee is under the appropriate care and

treatment of a doctor throughout the disability).)  In fact, Defendant expressly

requested additional information pertaining to Plaintiff's tremors, but no such

information was available given Plaintiff's lack of treatment and testing therefor.

(AR 335, 380.)

Plaintiff also argues that Defendant ignored evidence, much of which came

from its own medical and vocational experts, which tended to support Plaintiff's

---

[16] It is reasonable for a plan administrator to require objective medical evidence in support of a claim for LTD benefits, even if the plan does not specifically require it. *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1355-56 (M.D. Fla. 2004); *see also Doyle*, 542 F.3d at 1358 (determining it was reasonable for Liberty Life to rely only on objective medical evidence supporting Plaintiff's claim where the plan required proof of disability, such as chart notes, lab findings, test results, x-rays, and/or other forms of objective medical evidence); *Meadows v. Am. Airlines, Inc.*, 2011 WL 1102774, *14 (S.D. Fla. Mar. 24, 2011) (internal citations omitted) ("The Eleventh Circuit has held 'where the plan puts the burden on the claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective.'").  "Where a plan requires proof of continued disability, 'the very concept of proof connotes objectivity.' . . . 'Were an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." *Hufford*, 322 F. Supp. 2d at 1356.

42

claim.  Specifically, Plaintiff asserts that Defendant ignored Dr. Cosgrove's restrictions after its VRC opined that those restrictions would render Plaintiff unemployable.  However, there is no indication that Defendant ignored Dr. Cosgrove's or any of the other medical opinions for that matter.  (*See* AR 373.) Defendant considered the entire record in this case and apparently gave more weight to some opinions than to others.  Even assuming that Defendant's decision was somehow wrong, it was certainly not arbitrary or capricious to give "more weight to the opinions of some experts than to the opinions of other experts."  *Slomcenski v. Citibank, N.A.*, 432 F.3d 1271, 1279-80 (11th Cir. 2005).

Further, Plaintiff appears to suggest that Defendant should have accepted the VRC's conclusion that there would be no "appropriate, gainful occupations for which [Plaintiff] would qualify in either of her labor markets," considering Dr. Cosgrove's restrictions, her high school education, and gainful wage.  (AR 326, 328-30.)  However, because Plaintiff had the burden to prove disability, Defendant was under "no obligation to conduct a vocational assessment." *Townsend*, 295 F. App'x at 978.  "A claims administrator reviewing benefits eligibility under an 'any occupation' standard is not required to 'collect vocation evidence' in order to 'prove there are available occupations for the claimant.'" *Richey*, 608 F. Supp. 2d at 1312.  Under the Plan, Plaintiff was required to show that after the 24-month period, she was unable to earn more than 60% of her indexed predisability earnings from any employer in her local economy at "any

43

gainful occupation" for which she was reasonably qualified.  (*See* Doc. 1-1 at 19.)
Plaintiff has not satisfied that burden.

Finally, in determining whether Defendant's decision was arbitrary and
capricious, one factor to take into account is whether Defendant was acting under
a conflict of interest.  "A conflict of interest exists where the plan administrator
determines eligibility for benefits and also pays those benefits out of its own
assets." *Townsend*, 295 F. App'x at 975.  The significance of the conflict of
interest as a factor will depend on the circumstances of each case.  *Glenn*, 554
U.S. at 108.  It "should prove more important (perhaps of great importance)
where circumstances suggest a higher likelihood that it affected the benefits
decision, including, but not limited to, cases where an insurance company
administrator has a history of biased claims administration." *Id.* at 117.  In
contrast, "[i]t should prove less important (perhaps to the vanishing point) where
the administrator has taken active steps to reduce potential bias and to promote
accuracy, for example, by walling off claims administrators from those interested
in firm finances, or by imposing management checks that penalize inaccurate
decisionmaking irrespective of whom the inaccuracy benefits." *Id.*

Plaintiff has not satisfied her burden to prove that Defendant acted under a
conflict of interest.  Plaintiff has not shown, or even argued, that a conflict of
interest existed.  Based on the pleadings, it appears that the Kroger Company
was the Plan Administrator, while MetLife was the Claim Administrator for LTD

benefits under the Plan, and Metlife issued a group policy of insurance to the Kroger Company that funded LTD benefits payable under the Plan.  (Docs. 1 & 7.)  To the extent Plaintiff suggests the existence of a conflict by arguing that certain evidence was ignored, *Meadows*, 2011 WL 1102774, at *22, the undersigned has rejected this argument.  Moreover, even if a conflict was present, a lack of evidence of "malice, self dealing, [or] a parsimonious claims granting history" would render the conflict of low importance.  *Id.* (internal citations omitted).  Therefore, even assuming Defendant was acting under a conflict of interest, it should not affect the Court's determination that Defendant's decision was neither wrong nor arbitrary or capricious because there is no evidence of "malice, self dealing, [or] a parsimonious claims granting history."

In support of a final judgment in its favor, Defendant also argues that this lawsuit is untimely under the Plan's three-year contractual limitations period because it was filed on May 6, 2015, or almost five months after the December 18, 2014 deadline.  Because the undersigned recommends that final judgment be entered in Defendant's favor on the merits of Plaintiff's claim, the Court need not address the issue of timeliness.

Accordingly, it is respectfully **RECOMMENDED** that:

1.      Defendant's Motion (**Doc. 20**) be **GRANTED.**

2.      Plaintiff's Motion (**Doc. 19**) be **DENIED**.

45

    3.      The Clerk of Court be directed to enter judgment accordingly,

terminate any pending motions, and close the file.

    **DONE AND ENTERED** in Jacksonville, Florida, on August 1, 2016.


                                        _____
                                            MONTE C. RICHARDSON
                                        UNITED STATES MAGISTRATE JUDGE


Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record